# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### Atlanta Division

**PAMELA EDWARDS,**
*for herself and on behalf of*
*all similarly situated individuals,*

**Plaintiff,**

**v.**                                          **CASE                    NO:**
**1:13CV3002WSD-JFK**

**HORIZON STAFFING, INC.**

**Defendant.**

## DECLARATION OF SUSAN M. ROTKIS

In relation to the Plaintiff's Motion for Final Approval of Class Action Settlement, and pursuant to the laws of the United States and under penalty of perjury, I declare:

1.    I am an attorney at Consumer Litigation Associates, P.C.

("CLA") who has been the primary attorney assigned to the above-styled

case.  Together with Leonard Bennett, who is the principal and founder of

the firm, my direct supervisor, and the brains of the operation, we have taken

all reasonable, necessary, and prudent actions to successfully research,

develop, prosecute and settle this class action on behalf of Ms. Edwards and

the class.

1

2.     I make this declaration as a supplement to my declaration in support of the Plaintiff's uncontested Motion for Final Approval of Class Action Settlement. (Doc. 22-4.)

3.     Vicki Ward, an experienced paralegal in our office, was the first person at CLA to speak with Ms. Pamela Edwards when she called CLA in approximately January of 2013. Vicki did all of the initial intake, client communication, gathering and organizing of documents, as well as writing an extensive memorandum of all the evidence and facts of the case in order for Mr. Bennett and I to make a decision about whether to accept the case. Ms. Edwards first contacted Ms. Ward in approximately January of 2013.

4.     I reviewed the memorandum, documents, consulted the NCLC FCRA manual and reviewed other similar cases where we had represented consumers in cases against employers, especially where the employer failed to provide a copy of the consumer report containing a derogatory public record, a pre-adverse action notice, and a summary of the FCRA rights. It was the first case I had represented a client against a staffing agency, and so I also researched whether Horizon's status as a staffing agency had any impact on its FCRA obligations. Ms. Edwards facts and documents also demonstrated that she had causes of action against three other entities for discreet violations of the FCRA, including against Backgroundchecks.com,

2

where we already had several other clients with the same or similar claims against BGC.

     5.     CLA is a plaintiff's law firm and we work on contingency, almost exclusively in fee shifting cases on behalf of consumers such as this case. After reviewing the documents supplied by Ms. Edwards, the research done by Vicki regarding Horizon Staffing, the FCRA, the NCLC FCRA manual, and other similar cases, I discussed the case with Mr. Bennett. He believed that case presented a classic class action fact pattern wherein Horizon treated all of its consumer job applicants the same, visiting the same FCRA violations on all consumers who applied for a job there, and thus the case was suitable for class action treatment.

     6.     I rarely bill clients on an hourly basis. My law firm has established my hourly rate as $425/hour. This is the rate my law firm charges for my time, and the rate that our clients regularly agree to. I recently billed and was paid for my regular hourly rate of $425/hour when I was engaged as a mediator in a civil matter. The last time my hourly rate was specifically approved by a court was in 2011, in *Foster v. Carpenters of Faith*, Civ. No. GV 11030283-00, a Virginia General District Court case, Newport News Division. In 2011, my firm had established my rate at $350/hour. Shortly after that case, my firm established my rate to be

$375/hour. In July of 2012, I supplied a Declaration in support of the application for attorneys fees by another lawyer in the United States District Court for the Eastern District of Virginia. In that case, the court specifically found my declaration referencing my 2012 hourly rate of $375/hour in a consumer protection case to be fully credible. *Richardson v. William Schneider & Assoc.*, Civ. No. 4:12cv25 (E.D. Va. July 24, 2012)(Doc. 18.). In the fall of 2014, our firm retained expert counsel to review our rates. At that time, my rate was $425/hour. The expert found that our rates were well within the range of acceptable rates for class action counsel nationally.[1] My current hourly rate of $425 has been included in fee applications which were all approved in the following cases: In *Goodrow v. Freidman & MacFadyen*, No. 3:11CV20-MHL (E.D.Va. June 4, 2014)(Doc. 211), the FDCPA-class settlement provided for $550,000 in attorneys fees and costs, which were approved based on counsel's lodestar including both my hourly rate and Mr. Bennett's hourly rate. Other courts have approved the fee as a percentage-

---

[1] In *Berry v. LexisNexis Risk & Information Analytics Group, Inc., et al*, 3:11cv754-JRS-MHL, Class Counsel engaged an expert to provide a Declaration concerning prevailing attorneys rates in support of the application for fees in that case. These rates are also in line with the publicly available information regarding rates charged by lawyers on both the plaintiff and defense sides, as compiled from public filings establishing attorneys' billing rates. (Prof. Miller Decl. ¶¶ 31–34 (setting out these rates and their sources, and concluding Class Counsel's rates here "are appropriate and reasonable")(Doc. 103-1 at 13-17). The Court has not yet ruled on the motion for fees in *Berry*, however, other courts have recently approved requests for Class Counsel's fees in other cases.

of-the-fund cases, but with cross-checks supplied by counsel. *See, e.g.,*

*Shami v. Middle East Broadcast Network*, No. 1:13CV467-CMH (E.D.Va.

April 30, 2014)(Doc. 21); *Roe v. Intellicorp, Inc.,* No. 1:12CV2288-JG

(N.D.Oh. June 5, 2014)(Doc. 139); *Reardon v. ClosetMaid, Inc.*, No.

2:08CV1730-MRH (W.D.Pa. June 13, 2014)(Doc. 220); *Soutter v.*

*TransUnion, LLC.*, No. 3:10CV514-HEH (E.DVa. June 4, 2014)(Doc. 57);

*Stinson v. Advance Auto Parts, Inc.*, No. 7:12CV433 (W.D.Va. Jan. 17,

2014)(Doc. 34.) No court has ever found my hourly rate to be unreasonable.

No court has found the number of hours I have expended on a case to be

unreasonable.

This court has approved the hourly rate and fee of one of my

colleagues with whom CLA has co-counseled on other cases, including

notably *Berry v. LexisNexis* and *Teagle v. LexisNexis*. Mr. Marchiando is a

skilled class action lawyer at Caddell & Chapman in Houston, Texas. As an

associate with 9 years of experience, his firm billed his time at $425/hr in

2013 when this court approved the fee application in *Teagle*. My firm has

only recently raised my rate to $425/hour within the last year, for an

experienced attorney with nearly 18 years of experience.

7.     My law firm has established Mr. Bennett's rate to be

$575/hour. To the best of my knowledge, no court has found this rate or the

hours he has expended on a case to be unreasonable.  Except *Richardson*, Mr. Bennett has been lead or co-lead counsel on each of the cases included in paragraph 6. If anything, I believe Mr. Bennett's rate is on the low or conservative side of the spectrum for someone with his skill, experience, knowledge, reputation, and willingness to represent consumers in tough cases against well-funded defendants in any court in the country.

8.      While Mr. Bennett and I rarely bill on an hourly basis, I keep track of time that I spend on various matters, in particular time-consuming tasks for which I have to budget resources and my time.  I do not generally track time that is less than 15 minutes.  I regularly complete tasks of less than 15 minutes in all my cases, including this one, much of which is correspondence, phone calls with opposing counsel, phone calls with the client, and communication.

9.      I have been in regular communication with Ms. Edwards since we agreed to represent her.  She is a very diligent client who is involved deeply in her case.  She has suffered tremendously as a result of the mixing of her background report, and I am doing my utmost to represent her and the class to the best of my ability.  She agreed to forego pursuing this case as an individual case in order to represent the class.  Ms. Edwards has communicated to me that she wants to make sure that what has happened to

6

her doesn't happen to other people.  Although she has suffered, actual damages are difficult to prove in relation to the claims alleged in the Complaint.  Congress created statutory damages for just this reason, and this case was suitable for class treatment as well. Ms. Edwards understood that when she chose to pursue this matter as a class action.  I have been communicating with Ms. Edwards about both of her ongoing cases, and except for discreet items of preparation for deposition, conduct of deposition, answering and propounding discovery in the Backgroundcheck.com case, I have not segregated out the number of minutes I spent talking to her about each case.  However, the tasks that presented themselves were segregated by the nature of the case, and I have not included time that either I spent or that Ms. Edwards spent on other matters in this case.   But for Ms. Edwards tenacity, her diligence in seeking counsel that understands the FCRA in the employment context, and her own commitment to justice, this case would not have been brought.

10.     In this case, I have expended approximately 81.25 hours in the prosecution of this case, not including the final fairness hearing or supplemental information that the court requested.  I have taken primary responsibility for the day-to-day management of the litigation, client and opposing counsel communication since the filing of the complaint.   While I

7

have been the primary attorney on the case, I am assisted by Ms. Ward and Ms. Chaffer, and final approval of my work rests with Mr. Bennett.

9.     On occasion, other courts have requested that our firm provide information regarding the amount of time we have expended on certain tasks related to the prosecution of the class action. *See e.g. Pitt v. K-Mart,* 3:11CV697-JAG (E.D.Va); *see also Manual for Complex Litigation 4th*. These tasks include:

-discovery;

-mediation/settlement conference (including preparation and participation);

-settlement documentation;

-settlement administration;

-pre-filing preparation and research;

-internal file work;

-communication with co-counsel and

-motions  practice.

10.    I have been the primary attorney who has performed all of the above tasks, with consultation and supervision of Mr. Bennett and Ms. McRae. The time and labor required to do the tasks for which I have tracked my time are very conservative.

a.    Discovery:  6 hours (working with Ms. Ward to draft, finalize and serve Plaintiff's Rule 26(a)(1) disclosures, including documents; drafting, finalizing and serving Plaintiff's First Request for Production of Documents, First Interrogatories; researching Defendant's disclosed fact witnesses Michael Emanuele, Paula England, Rita Boyd, Andrea Gillum, as well as any other employees of Horizon that Vicki and I could identify (such as Lisa Yannett and Ron Ramsey)).  I reviewed other prior cases with the same or similar allegations, the discovery we propounded in those cases, the objections that were made, and how we resolved such objections, the elements of the claims in the complaint and the 11th Circuit and Northern District of Georgia law on point.  I reviewed deposition notices from other cases, and the motions for class certification that we had filed, to ensure that I was seeking relevant information that I could defend propounding, that I would use to support class certification and summary judgment.  We did not start from scratch to craft, but we didn't just recycle discovery that may or may not be relevant because we want to efficiently obtain the discovery needed to prove the Rule 23 elements on class certification.

The Defendant did not serve any objections or responses to Plaintiff's discovery because we settled the case before discovery responses were due. The crafting and service of discovery, together with the imminent due date

for objections and responses, was a significant factor in the settlement of the case. The Defendant did not propound discovery, but at all times, Ms. Edwards was prepared to answer and participate in the discovery process, which I discussed with her on multiple occasions. Ms. Edwards fully participated in the discovery process in the Backgroundchecks.com case, which I had every reason to believe she would be as engaged and helpful in this case.

b.    Mediation/settlement conference: 16 hours (preparing for and engaging in settlement conference) In addition to simply drafting the settlement conference memorandum in conformity with J. King's order, I not only reviewed the documents and pleadings in the case, but also the law on point, which also included internalizing many other factors that dealt with strategy. I discussed all of these issues at length with Mr. Bennett and Ms. McRae, in anticipation of Defendant's mediation statement and J. King's preparation for the settlement conference. I also had several conversations with Mr. Holden up to an including January 27, 2014, at which time I communicated a formal written demand, with reasons and support for the demand, including the settlement agreements in other, similar cases, and case law justifying our demand and our position on the class period.

I took seriously the task of integrating/anticipating Defendant's mediation position given my many interactions with opposing counsel. For instance, over the course of several telephone lengthy conversations and email correspondence, counsel discussed in detail Defendant's position on its defenses including that Defendant had served a Rule 68 offer of judgment, which I determined to be ineffective as an OOJ and was not accepted. Also, it has been a tactic of some in the defense bar to attempt to pick off class representatives with OOJs, to move to dismiss based on mootness when an OOJ is not accepted, and to preemptively defeat class certification by service of an OOJ prior to class certification. I have dealt with this very issue in two other recent class cases, *Smith v. Res-Care* and *Milbourne v. JRK Residential America.* I also had to consider what I anticipated Defendant's arguments to be to limit or show that no class existed, that the limitation period should be two years, rather than five years, its argument that the class could only recover for a unitary harm despite the fact that the Defendant committed three violations, that Defendant orally told the applicants what was wrong with their consumer report if they asked, and that Defendant made copies of the consumer report available to the consumers to be picked up. I spent significant time considering each of the

11

Defendant's arguments and how to compress it all into a mediation statement.

I also spent significant time preparing Ms. Edwards for the settlement conference. We spent over one hour discussing what to expect at the settlement conference, what the purpose of the settlement conference was, what the position of each side was, and how and whether she would participate. She planned to be in attendance, and I communicated with her throughout the day before the scheduled settlement conference as well as January 30 and 31, 2014.

Due to weather, instead of traveling to Atlanta on the date of the settlement conference all counsel: Mr. Holden, Mr. Rosen, Mr. Bennett, Ms. McRae and I all participated throughout the day in lengthy settlement negotiations. We had spoken with opposing counsel at length the prior day in anticipation of the weather, and had planned to use the time we set aside for the settlement conference to attempt a telephonic conference. The time we spent on the telephone among co-counsel, opposing counsel and with our client was more than three hours in total. At the end of the day on January 30, 2014, we had made progress, but in reality we were still far apart.

The court contacted counsel to set a conference call for February 4, 2014. In anticipation of resetting the settlement conference and reporting to

J. King the status of the case, all counsel agreed to capitalize on the momentum from the prior day's discussions and resume negotiations prior to the call with the court. After both telephone calls and emails, primarily at that point between Mr. Holden and Mr. Bennett, we agreed in principle to the settlement structure we ultimately memorialized in the settlement agreement, but still had several serious issues to work out such as settlement administration. Plaintiff wanted to hire a third-party settlement administrator, namely McGladrey or other well-respected class action administrator. Defendant insisted that Plaintiff's counsel should act as class administrator since it is such a small class, and Plaintiff's counsel had done so in other cases. Plaintiff's counsel agreed to this term.

On the Feb. 4, 2014, call with the court, which was very brief, the Parties reported that we had settled in principle but still had significant work to do in crafting the settlement agreement, class notice, deciding how to administer the class, developing the class list, and implementing the notice plan. The magistrate judge was informed of the proposed settlement to provide $1000.00 to each class member, that the class size was expected to be 292. After negotiating complete relief for the class, all agreed that the class representative would be eligible for $10,000.00 as an incentive award and that Class Counsel would apply for $110,000.00 in fees. I discussed the

13

proposed settlement at length with Ms. Edwards, at which time she agreed

on behalf of the class.

c.      Settlement documentation 18 hours (drafting, editing, circulating and

finalizing (1) settlement agreement, (2) class notice, (3) motion for

preliminary approval, (4) memorandum in support of preliminary approval;

(5) proposed preliminary approval order. Despite the fact that I have drafted

many settlement agreements and stipulations of settlement, and I have many

sample documents, it is nonetheless a time-consuming, attorney task to draft

a document that identifies each term accurately and that is complete and fair.

Upon agreement in principle, we still had many terms to work out, which we

did over the course of the next several weeks.  I drafted the initial settlement

documents, memorandum, motion, notice and proposed order and circulated

them among counsel.  Drafts and edits were exchanged, updated, and finally

agreed between the parties.  We also continued to negotiate terms such as

potential *cy pres* recipients that would best approximates relief to the class,

and timing and class administration. Defense counsel, Mr. Bennett, Ms.

McRae and I, exchanged, edited and further negotiated drafts until reaching

the final result that was filed on March 26, 2014, with the approval of both

the Plaintiff and the Defendant.

d.      Settlement administration:  4 hours (supervising notice program,

creating script for class members who call, creating schedule for

implementation of notice program, answering class member questions.)  Our

law firm agreed to act as Class Administrator.  We are a small, but efficient,

firm.  After the court entered preliminary approval of the class action

settlement, I met with Ms. Chaffer and Donna Winters, our business

manager/paralegal.  We strategized to establish the best, most effective

method of administering the class notice, fielding calls, answering questions,

establishing the website, setting the schedule that we had to follow, and

assigning the tasks that needed to be accomplished and who would do it. Ms.

Chaffer was the primary person to execute the tasks to format the draft

notice, print notices, fold, stuff, label, and post.  She also would transform

the class list into mailing labels.  Ms Chaffer spent considerable time

reviewing the Settlement Agreement and Court Orders to make sure we

adhered to the deadlines and provided maximum possible notice to the class.

The first problem that presented itself was the fact that 23 of the Class

Members did not have addresses.  I asked Mr. Holden to please ask his client

to search for their addresses, which he did, but the Defendant simply had no

information on their addresses.  Mr. Bennett and I discussed how to handle

this issue, and at Mr. Bennett's direction I inquired whether of one defendant

CRAs counsel (not associated with this matter) whether and how such a CRA could assist us in locating addresses for the individuals with the information we had – which included the name, date of birth and some social security numbers. At that time, we decided that with the information available, we would likely have as much success locating absent class members by searching publicly available databases for the missing addresses as commercially available databases. Dawn Chaffer, Viera Harrah and I used publicly available databases for this purpose. Among the three of us, we searched whitepages.com and 411.com and found several of the addresses.

Once we established our schedule and tasks for administration of the class notice, Ms. Chaffer handled all aspects of the notice program, including being the first person to respond to Class Member calls. Of the calls she answered, she had to forward two of the callers to me. When callers have difficulty understanding the notice or the script, or want to talk to an attorney, the call is forwarded to me. Both callers were class members, and once they understood the settlement, they were ecstatic not only about the cash payment, but also to learn about the FCRA requirements. Both callers I spoke to expressed gratitude to me, CLA and to Ms. Edwards for bringing the case forward. Throughout the notice period, Ms. Chaffer and I

16

communicated regularly about the calls -- this case, the lack of -- any

objections, exclusions, or requests to be heard, notices returned, scrubbing

returned notices for new addresses, contacting Nate Mason to search for

addresses on Accurint.  While monitoring the notice program, I was mindful

of whether the notice program was successful in reaching the class members.

At the end of the notice period on June 24, 2014, I was satisfied that we had

achieved better than a 90% delivery rate for all class members, with only 27

notices returned as undeliverable.  In our final approval motion, I did not

account for the 15 class members for whom we had no address to begin

with, nor the 9 for whom we were unable to locate a forwarding address.

The correct number of class members for whom we could not locate an

address inadvertently was not reflected in Ms. Chaffer's Declaration.

By the date that I filed the motion for final approval, four more

notices were returned as undeliverable without a forwarding address.  In her

June 30, 2014, Declaration, Ms. Chaffer included the number of

undeliverable notices:  31. I calculated the effective delivery rate to be 90%

delivery rate. After the date of the final fairness hearing, an additional two

notices were returned, bringing the total to 33 undeliverable notices.

Considering the total number of undeliverable notices plus the total number

of class members for whom we could not locate an address, 42

(undeliverable) + 15 (never found an address) = 57. The percentage of class members that did not receive mailed notice was 19.7%. Therefore the effective delivery rate was 80%. This delivery rate is still within the delivery rate that has been approved by courts as an effective notice program. Indeed, Plaintiff's counsel used reasonable effort and means to find the missing addresses of class members and otherwise used the most effective means to reach the class member. *Eisen v. Carlisle & Jacqulin*, 417 U.S. 156, 177-179 (1974); *accord, In re Nissan Antitrust Litig.*, 552 F.2d 1088, 1098-99 (5th Cir. 1977).

The Fifth Circuit explained the reasonableness standard in this way:

> Taken together these cases establish the principle that the type of notice to which a member of a class is entitled depends upon the information available to the parties about that person. Consistent with this general principle, subdivision (c)(2)'s reasonable effort standard requires that, once a 23(b)(3) action has been certified, the name and last known address of each class member known to the parties or capable of being identified from business or public records available to them must be produced.[11] The source or sources providing the greatest number of names and addresses must be used. Obviously, the word "reasonable" cannot be ignored. In every case, reasonableness is a function of anticipated results, costs, and amount involved. A burdensome search through records that may prove not to contain any of the information sought clearly should not be required. On the other hand, a search, even though calculated to reveal partial information or identification, may be omitted only if its cost will exceed the anticipated benefits.[12] Here, we know that the RDR cards provide the court with the best

> available listing of the names and addresses of all class
> members. Indeed, the parties agree on this. They only shy
> from undertaking the effort. While the search cannot be
> made with push-button ease, its advantages bring the
> effort required within the range of reasonableness.

*In re Nissan Antitrust Litig.*, 552 F.2d at 1098-99. The problem with the

missing addresses is a different problem than not being able to identify the

class members at all.  We know who the class members are; we have the

names of the individual class members.  We have used reasonable efforts to

locate their addresses using their names, general geographic location, and

when available dates of birth, using the Defendant's list, as well as public

and commercial databases.  In this case, the Class Members are job-seekers

who are, perhaps like the named plaintiff, itinerant and unable to obtain

stable housing and employment that makes locating them more difficult.

In addition to the mailed notices, the Class Notice was published on

the Internet a publicly-available website containing the Class Notice, among

other important documents in the case such as the Complaint and

Preliminary Approval Order.  Making such information available to the

public via the Internet is publication of the Notice, which is searchable and

accessible to the broadest audience possible:  the general public.  Publication

of notice has been recognized as a suitable means of reaching absent class

members.  Together the mailed notice program and the website constitute

reasonable effort and means by which class members have been notified of the proposed settlement.

e.  pre-filing preparation and research: 3 hours (reviewing the intake matrix, reviewing documents, statute, other similar cases, analyzing for jurisdiction and venue, reviewing complaint, contacting local counsel.) Ms. Ward accomplished the lion share of the pre-filing research and preparation. My role was to analyze the facts and the law – together with Ms. Ward and Mr. Bennett – prior to making a decision on whether to represent Ms. Edwards, and prior to filing.

f.  internal filework: 0 (catchall for administrative tasks, internal memos, research of discrete issues that arise, communication.) Though I performed administrative tasks, I did not have to produce any lengthy communications or write internal briefs in this case.

g.  communication with co-counsel: 2.25 hours (telephone calls and strategy meetings with the team.) Throughout the case, Mr. Bennett and I primarily strategized as tasks arose. There were four main strategy sessions involving all co-counsel: (1) case evaluation; (2) analysis of OOJ and whether it was proper under Rule 68; (3) motion for class certification; (4) preparation/post settlement conference.

h.      motions practice: 34 hours (research and write motions for class

certification with brief in support; preliminary approval with brief in

support; final approval with brief in support).  Although there were no

contested discovery or dispositive motions in this case, the class action

plaintiff is required under the local rules to file a motion for class

certification within a short period of time after filing the Complaint.

Together the motion for class certification, for preliminary approval and for

final approval, represent complex, substantive motions that are completely

the responsibility of the plaintiff to demonstrate the requirements of Rule 23

are met.  I was the primary attorney that wrote each motion and supporting

brief in this case. Ms. McRae and Mr. Bennett reviewed my work prior to

filing.  I spent more than ten hours on each brief in support of the three

motions that I filed.  However, because I tend to be a slow brief writer, and I

had to acquaint myself with the rules of the Northern District of Georgia, the

law of the district and the Eleventh Circuit, I exercised billing discretion

reducing this time to 34 hours.

i.      other work:  12 hours (final fairness hearing, supplemental

information and briefing requested by the court at the final fairness hearing.)

Because I was the primary attorney on the case and local counsel was

recovering from surgery, I traveled from Virginia to Atlanta to appear for the

final fairness hearing. In addition to normal preparation for the hearing by reviewing the case file and case law, I also spoke to my client at length about what to expect, and spent about 30 minutes speaking with a class member that appeared at the hearing without prior notice.

j.      Mr. Bennett's role in this case was one of a supervisor and strategist, but his role is indispensible and critical to the success we achieved for the class. He expended 22.5 hours reviewing the documents, potential claims, revising the Complaint, and reviewing all the pleadings and settlement statement, most of which were rather lengthy. He also participated fully in the settlement process, including telephone and email with co-counsel and opposing counsel. The number of hours he expended in the case were necessary to the success achieved for the class, and quite conservative.

k.      Ms. McRae is an experienced attorney on both sides of the "v." Since leaving the defense side of the "v," Ms. McRae has reduced her hourly rate to be $475/hour. In this case she incurred 15.5 hours for a total lodestar of $7,362.50. We have leaned on Ms. McRae to guide us through litigation and strategy throughout the case. At the time I filed our motion for final approval, I didn't include Ms. McRae's hours in the application for fees.

        The reasonable time and labor required to prosecute this case militates in favor of awarding the fee requested.

11.     The legal questions and the application of law to fact in this case were neither novel nor difficult for the experienced FCRA attorneys in this case. However, as demonstrated by the Plaintiff's search for counsel, there are a limited number of FCRA attorneys in the country that would take such a case that not only the plaintiff, but the jurisdiction and venue were geographically distant; that required association of local counsel; that and required litigating in a U.S. District Court where we don't normally practice. Still fewer are attorneys with not only CLA's experience in FCRA, but also in class action and complex litigation that made this case the success it was for the class. At the outset of the case, the causes of action and defenses were obvious. However, the quality of defense counsel in the case made it all the more important that we do our job with excellence as counsel articulated novel and potentially persuasive defenses to Plaintiff's class claims. For instance, when Defendant's counsel served an Offer of Judgment, we had to consider not only whether to accept or reject, but even whether to respond if it was not in compliance with Rule 68. The novel defense class action strategy that has met with limited success is to move to dismiss based on mootness after a Rule 68 OOJ is rejected. We had to analyze the risks associated with that defense strategy, and whether it was like *Genesis Healthcare*, or more like *Milbourne* and *Smith*.

23

While I originally felt that this case did not present unusually novel or difficult questions, Defendant's counsel capitalized on the dearth of precedential case law on certain aspects of Plaintiff's claims and class definition that would create a much contested motions practice if the case were to proceed in litigation. This factor, which I originally believed was inapplicable, actually militates in favor of the fee requested.

12. The skill and expertise required to spot the claims, identify the proper party defendants, to understand the relevant statutory provisions, case law, FTC regulations, Rule 23 standards, to be able to draft the complaint, file it and ultimately prosecute an FCRA class action in federal court is rather high. There aren't too many lawyers and law firms nationwide that have such a practice. This statement could sound self-serving but for the fact that the number of similarly-experienced FCRA class action litigators in the country is relatively small precisely because the skill to properly perform the legal services is high.[2] This factor militates in favor of the fee requested.

13. Because there are relatively few FCRA attorneys in the country, taking Ms. Edwards case necessarily means preclusion of other employment.

[2] In a recent district court decision on a motion to disqualify settling counsel – which included CLA -- in an FCRA class action, the court opined that while both counsel were skilled and experienced, settling counsel (including CLA) unquestionably had more class action, consumer class action and

Our firm is small, with only seven attorneys. Yet, we are able to manage one of the most robust federal litigation practices in the country. Before joining CLA in 2010, I had known Mr. Bennett for ten years. For over six and half years, I got to know him and his work as I served as a law clerk in the U.S. District Court in Richmond, VA. I admired his skill, expertise, as well as the fact that he was able to develop a unique expertise in FCRA such that I wanted to join his practice. Since joining CLA, I have turned down numerous cases. I currently have tabled six cases, including three class actions very similar to this case, because our caseload is very high. We inform tell potential clients that we cannot promise the immediate filing of any case due to the volume of cases, which includes this case. While we were able to settle this case relatively soon after filing, our obligations in a class action settlement are significant, as it should be.  If we had not settled as we did, we would have continued to vigorously prosecute the case through every stage of discovery, motions practice, and through to trial, including any appeals. With a firm of our size, it is my experience that every case we file results in some way of either precluding or delaying the filing of another case. This factor militates in favor of awarding the fee requested.

---

FCRA experience. *White v. Experian Info. Sols. Inc.*, Civ. No. 8:05CV1070

14.    The customary fee in a percentage of the fund case is 20-30%. This court has approved fees over 30%, and the Eleventh Circuit has held that fees of up to 50% may be appropriate. Plaintiff is not moving for 50%, Plaintiff is moving for 37% of the fund. The Eleventh Circuit has held that if the fee requested is over 30%, then the court should consider other factors, including the 12-factors described in *Johnson v. Ga. Highway Express, Inc.* *Camden I Condo Ass'n Inc. v. Dunkle*, 946 F.2d 768, 772, n3 (11th Cir. 1991). The factors are not exclusive. *Id.* at 775. The Supreme Court has opined that the most critical factor in determining the reasonableness of a fee is the degree of success obtained. *Farrar v. Hobby*, 506 U.S. 103 (1992). In this case, each Class Member will received approximately $600 without having to do a thing: there is no coupon, no claim in process, no further contact required. They will all receive a substantial amount of money right away. Most of the Class Members probably had no idea their rights had been violated, precisely because Horizon never provided any of them with their summary of FCRA rights and also because they may have a negative public record. Having a derogatory public record doesn't erase a consumer's FCRA rights, and in many cases, a derogatory public record can even trigger an FCRA right. No Class Member had to find their own lawyer, pull

---

(C.D. Ca.  Jan. 21, 2014)(Doc. 952.)

together evidence, provide other extensive intake information, be available to participate in discovery, advance a filing fee, or take any other action that is normally necessary to vindicate a federal claim.

I have represented plaintiffs in many federal class action settlements, and this settlement provides significantly more cash to class members than most of which I am aware. The relief attained for the class members militates in favor of the requested fee.

15.     The fee earned in this case was earned on a contingent basis, neither Ms. Edwards nor the class had to advance any attorneys' fees or costs.  Plaintiff's counsel shouldered the entire risk of the litigation, which risk we deemed worthy because of the strength of the Plaintiff's claims and our skill in FCRA class actions.  The fee was negotiated only after complete relief for the class was agreed.    Plaintiff's counsel prosecuted the case in as an efficient, reasonable and cost-effective manner while at the same time using all the legal acumen, experience, and skill in maximizing the outcome for the Class – whether it is through settlement or through litigation – counsel was prepared to take all steps necessary to maximize the outcome for the class.

16.     The attorneys of CLA have a reputation for excellence in the FCRA and Class Action litigation. *See e.g. Soutter v. Equifax Info. Servs.,*

27

*LLC,* 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) ("[T]he

Court finds that Soutter's counsel is qualified, experienced, and able to

conduct this litigation. Counsel is experienced in class action work, as well

as consumer protection issues, and has been approved by this Court and

others as class counsel in numerous cases."); *See, e.g. Williams v. Lexis-*

*Nexis Risk Mgt.,* No. 3:06CV241 (E.D.Va. 2008); *Beverly v. Wal-Mart,* No.

3:07Cv469 (E.D.Va. 2007); *Capetta v. GC Servs., Inc.,* No. 3:02cv288 (E.D.

Va.); *Ryals v. HireRight Sols. Inc.,* No. 3:09CV625 (E.D.Va.), *Daily v.*

*NCO,* No. 3:09CV031 (E.D.Va. 2011); *Conley v. First Tennessee,* No.

1:10CV1247-TSE (E.D.Va.)*; Lengrand v. Wellpoint,* No. 3:11CV333-HEH

(E.D.Va.); *Henderson v. Verifications Inc.,* No. 3:11CV514-REP (E.D.Va.

2013).

   The foundation of this law firm is built on consumer protection

litigation. We do nothing but represent the interests of consumers. These

matters, and others that resulted in dismissal or no class outcome, are the

necessary context for this petition for what in raw dollars may seem to be a

large fee. In this litigation as in all class cases, the attorneys who worked on

this case have tied their fate to that of the class. The fee is substantial in this

case for only one reason – both the class and the cash recovery for the class

are substantial. Not the potential recovery, or the non-monetary or the

abstract value. The cash that must leave the Defendant (it already has – it

has been paid into an escrow account managed by the Class Administrator)

is for the benefit of the class. This symmetry of incentives between counsel

and the class motivates Class Counsel to maximize class cash benefit to the

largest degree possible. If a common fund fee is capped at a dollar value

instead of a market percentage, there would still be an incentive to take such

cases, but there would then be a disincentive to stay the course and litigate

through an otherwise low common fund amount. It should work both ways.

As one district court pointedly reasoned:

> Simply put, the class action vehicle is broken. While it may not
> instantaneously or completely resolve the problems that
> currently inhere in this type of litigation, tying the award of
> attorneys' fees to claims made by class members is one step that
> judges can take toward repair. This approach will not only
> encourage more realistic settlement negotiations and
> agreements, but also will drive class counsel to devise ways to
> improve how class action suits and settlements operate. *See*
> Deborah R. Hensler and Thomas D. Rowe, Jr., *Beyond "It Just
> Ain't Worth It": Alternative Strategies for Damage Class Action
> Reform,* 64 Law & Contemp. Probs. 137, 150 (2001) (" 'The
> single most important action that judges can take to support the
> public goals of class action litigation is to reward class action
> attorneys only for lawsuits that actually accomplish something
> of value to class members and society.' **To this end, ...
> analysts recommend[ ] that judges award fees based on the
> actual amounts paid out by defendants to class members,
> notwithstanding contrary case law." (quoting Deborah
> Hensler et al., Rand, Class Action Dilemmas: Pursuing
> Public Goals for Private Gain-Executive Summary 33
> (1999))). Class counsel will have an incentive to pay
> attention to the needs and desires of the class and to "think**

> outside the box" to devise better notice programs,
> settlement terms, and claim procedures, all to the benefit of
> the consumers who have been harmed.

*In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 406 (D. Mass. 2008) (emphasis added).

In this case, Class Counsel shouldered the entire risk of the litigation, appropriately staffing it with experienced counsel, spending significant time to investigate the case prior to filing, strategically addressing issues raised in a dispositive motion, conducting the back and forth of discovery, vigorously litigating, and finally negotiating for almost a year to reach this result for the Class. Doing so required zealously litigating a complex federal case while at the same time attempting to identify the terms where the parties might find compromise. While the fee will be substantial – certainly so – it is well deserved and earned. The risks taken should be compensated, as law recognizes. But there was certainly substantial investment and risk incurred. Class Counsel requests a fee based on their earned percentage of the cash fund obtained. Yet there is no doubt that the excellent outcome in this case for the Class was the result of risk-taking and really hard work by a group of skilled lawyers.

In this case, and in all cases in which Plaintiffs' counsel will come before this Court, they submit that the proper measure of compensation

should be driven by the benefit actually obtained for the class members. Because Class Counsel's requested fee of 37% is reasonable under the circumstances of this case and the applicable law, the Court should award it.

17.  There are not many cases in which class counsel has obtained a gross amount for each class member of over $1000 each. The class is small, but the total class fund is $300,000.00. Courts have recognized an upper limit of 50% to avoid depleting the fund, but even larger percentages have been awarded. *Camden I*, 946 F.2d at 774-75 (citing Newberg § 2.08-51). In this case, there is no danger of the fund being depleted. In fact, every class member is guaranteed to receive a net amount of at least $600 after the payment of fees, costs and a service award to the Plaintiff. Other courts have awarded fees at this rate, which holds true even in instances where the class recovery runs into the hundreds of millions of dollars. *See e.g., In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d at 295 (approving award of thirty percent of $220 million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding thirty-six percent of $125 million).

A number of courts have also approved a percentage of the fund such as requested in this case. *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving award of 36% of $3.5 million settlement fund); *Strougo ex*

*rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (granting attorneys fees in amount of 33 1/3% of $1.5 million settlement fund); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33.3% of $3.8 million settlement fund); *Kidrick v. ABC Television & Appliance Rental*, No. 3:97cv69, 1999 WL 1027050, at *1-2 (N.D. W. Va. May 12, 1999) (awarding 30.6% of approximately $400,000 settlement fund, noting that "[a]n award of fees in the range of 30% of the fund has been held to be reasonable. . . . Fees as high as 50% of the fund have been awarded.") (citing *Camden I*).

The percentage of the fund awarded in similar cases militates in favor of awarding the fee requested.

The foregoing is true and correct to the best of my knowledge.

_____
Susan M. Rotkis